SOUTHWESTERN BELL
CORPORATION, et
al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, and United States of
America, Respondents,

United States Telephone Association,
et al., Intervenors.

Nos. 93–1562, 93–1568, 93–
1590 and 93–1624.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1994.

Decided Jan. 20, 1995.

Mark L. Evans, Washington, DC, argued the cause, for petitioner Southwestern Bell Corp. On the briefs were Martin E. Grambow, Washington, DC, James D. Ellis, Paula J. Fulks, San Antonio, TX, Robert M. Lynch, Richard C. Hartgrove, St. Louis, MO, and Thomas A. Pajda, Richardson, TX.

David W. Carpenter, Chicago, IL, argued the cause, for petitioners American Tel. and Tel. Co., Bell Atlantic Telephone Companies, New England Tel. and Tel. Co., and New York Telephone Co. With him on the briefs were Lawrence W. Katz, Arlington, VA, E. Edward Bruce, Robert A. Long, Jr., Washington, DC, Edward R. Wholl, White Plains, NY, Peter D. Keisler, Mark C. Rosenblum, and Roy E. Hoffinger, Basking Ridge, NJ, John Thorne, Arlington, VA, entered on appearance, for petitioner Bell Atlantic Telephone Companies.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., argued the cause, for respondents. With him on the brief were William E. Kennard, Gen. Counsel, F.C.C., Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., U.S. Dept. of Justice, Robert B. Nicholson and Robert J. Wiggers, Attys., U.S. Dept. of Justice, Washington, DC.

Donald B. Verrilli, Jr., Washington, DC, argued the cause, for intervenors. With him on the brief were Chester T. Kamin, Chicago, IL, Michael H. Salsbury, John B. Morris, Jr., Frank W. Krogh, and Donald J. Elardo, Washington, DC, for intervenor MCI Telecommunications Corp., James S. Blaszak and Patrick J. Whittle, Washington, DC, for intervenor Ad Hoc Telecommunications Users Committee, Albert H. Kramer and Robert F. Aldrich, Washington, DC, for intervenor American Public Communications Council, Genevieve Morelli, Alexandria, VA, for intervenor Competitive Telecommunications Ass'n, Andrew D. Lipman and Jonathan E. Canis, Washington, DC, for intervenor MFS Communications Co., Inc., Barry E. Bretschneider, Washington, DC, for intervenor Pilgrim Telephone, Inc., Leon M. Kestenbaum and Michael B. Fingerhut, Washington, DC, for intervenor Sprint Communications Co., L.P., Charles C. Hunter, Washington, DC, for intervenor Telecommunications Resellers Ass'n, R. Michael Senkowski, Robert J. Butler, and Kurt E. DeSoto, Washington, DC, for intervenor Personal Communications Industry Ass'n, Joseph W. Miller, John C. Gammie, Tulsa, OK, Peter A. Rohrbach, and David G. Leitch, Washington, DC, for intervenor Wiltel, Inc. Martin T. McCue, Washington, DC, entered an appearance, for intervenor U.S. Telephone Ass'n. James Lee Wurtz, Washington, DC, John Whitting Bogy, and James P. Tuthill, San Francisco, CA, entered an appearance for intervenors Pacific Bell and Nevada Bell. William Truman Lake and J. Roger Wollenberg, Washington, DC, entered an appearance, for intervenor Intern. Business Machines Corp. Robert B. McKenna, Jr., Denver, CO, entered an appearance, for intervenor U.S. West Communications, Inc. Mitchell Freed Hertz and Alfred Winchell Whittaker, Washington, DC, entered an appearance, for intervenor Ameritech Operating Companies. Matthew R. Sutherland, Atlanta, GA, entered an appearance, for intervenor BellSouth Telecommunications, Inc.

Before: EDWARDS, Chief Judge, SILBERMAN and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Concurring opinion filed by Circuit Judge SILBERMAN.

HARRY T. EDWARDS, Chief Judge:

This case presents yet another chapter in the Federal Communications Commission's ("FCC" or "Commission") series of attempts to relax the tariff-filing requirements for

nondominant common carriers. After initially adopting rules permitting nondominant common carriers to avoid filing tariffs, the FCC later adopted rules forbidding such filing. Courts struck down both attempts under the view that Congress's mandate in the rate-filing section of the Communications Act of 1934 ("Communications Act" or "Act"), that "[e]very common carrier ... shall ... file" tariffs with the FCC, 47 U.S.C. § 203(a) (1988), prevented such rules. Despite the Commission's policy rationales, courts found that the FCC had no authority to change Congress's clear command.

In this case, the FCC has attempted again to relax the filing requirements for nondominant common carriers, only this time it has proposed to adopt a policy of permitting nondominant common carriers to file a range of rates as opposed to fixed rates showing a schedule of charges. *Tariff Filing Requirements for Nondominant Common Carriers*, 8 F.C.C.R. 6752 (1993) ("*Range Tariff Order*"). Under this most recent proposal, nondominant carriers are given a competitive advantage over dominant common carriers. Petitioners American Telephone and Telegraph Company ("AT & T") and three Bell Operating Companies ("BOCs"), dominant common carriers under the FCC's rules, challenge the *Range Tariff Order*, alleging that it violates section 203(a) of the Communications Act, which requires all common carriers to file "schedules showing all charges." 47 U.S.C. § 203(a).

■ The Commission offers two principal arguments supporting the disputed *Range Tariff Order*. First, the FCC contends that section 203(a)'s mandate, that common carriers file "schedules showing all charges," does not preclude the use of a *range of rates* for particular charges. Because the Act does not define "schedules," the Commission argues, it reasonably could conclude that the Act allows the filing of a range of rates. Second, the FCC contends that, even if section 203(a) cannot reasonably be interpreted to allow some common carriers to file range tariffs, the Commission could adopt the *Range Tariff Order* under section 203(b), which grants the Commission authority to "modify any requirement" of the section. 47

U.S.C. § 203(b)(2) (1988 & Supp. V 1993). We are not persuaded by these arguments.

We find that the Supreme Court's recent decision in *MCI Telecommunications Corp. v. AT & T*, ____ U.S. ____, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) ("*MCI v. AT & T*"), which held that Congress granted the Commission very modest modification authority under section 203(b), largely disposes of the FCC's second argument. With respect to the Commission's first argument, we find that the *Range Tariff Order* violates the clear mandate of section 203(a), that every common carrier file "schedules showing all charges." 47 U.S.C. § 203(a). Because the Commission disregarded Congress's mandate in section 203(a) and overstepped the limited modification authority that it retains under section 203(b), we vacate the *Range Tariff Order*.

## I. BACKGROUND

### A. Congress and the Communications Act

Title II of the Communications Act contains the scheme Congress established to regulate the telecommunications industry. 47 U.S.C. §§ 201–228 (1988 & Supp. V 1993). The Act authorizes the FCC to regulate the rates charged for communication services to ensure that they are reasonable and nondiscriminatory. Section 203(a), the rate-filing provision, commands that, "[e]very common carrier ... shall ... file ... schedules showing all charges ... and showing the classifications, practices, and regulations affecting such charges." *Id.* § 203(a). Section 203(c) mandates that carriers charge only the filed rate, stating, "no carrier shall ... charge ... a greater or less or different compensation ... than the charges specified in the schedule." *Id.* § 203(c). Other provisions in title II are premised on the rate-filing provision. For example, if common carriers do not charge their filed rates, the Commission, by its own motion or upon complaint, may hold hearings and declare unlawful rate increases under section 204, and prescribe reasonable charges under section 205. *Id.* §§ 204, 205. Section 203(b) grants the Commission authority to "modify any requirement ... of this section either in par-

ticular instances or by general order applicable to special circumstances or conditions." *Id.* § 203(b)(2).

In 1934, when Congress enacted the Communications Act and created the FCC, AT & T held a virtual monopoly over the Nation's telephone service. The regulatory scheme Congress devised in title II meant to respond to that situation, to ensure competition among interstate common carriers and reasonable rates for consumers. In the 1970s, technological advances allowed competitors to enter the long-distance-service market. The Commission, recognizing the feasibility of greater competition, passed regulations to facilitate competitive entry. In 1979, with long-distance-service competition established, the FCC decided to reexamine tariff-filing requirements fearing that they served only to impose unnecessary costs on new entrants, and initiated a series of rulemakings, collectively known as the *Competitive Carrier* proceedings.

## B. The Commission and the Competitive Carrier Proceedings

In the *Competitive Carrier* proceedings, the Commission moved toward gradual deregulation of the nondominant common carriers in the interstate telephone industry. In its *First Report and Order,* 85 F.C.C.2d 1, 20–24 (1980), the FCC distinguished between dominant carriers, those possessing market power, and nondominant carriers, those not found to be dominant, and relaxed some of the filing procedures for nondominant carriers. *Id.* at 30–49. In the long-distance market, this amounted to a distinction between AT & T and the BOCs, dominant carriers, and everyone else.

In the *Second Report and Order,* 91 F.C.C.2d 59 (1982), the Commission adopted a policy of permissive detariffing, or optional filing, for some nondominant carriers, and extended that permissive detariffing to other nondominant carriers in the *Fourth Report and Order,* 95 F.C.C.2d 554 (1983). In its *Sixth Report and Order,* 99 F.C.C.2d 1020 (1985), the Commission made mandatory the detariffing policy, prohibiting nondominant carriers from filing tariffs.

MCI Telecommunications Corporation ("MCI") challenged the *Sixth Report and Order* which required MCI and other nondominant carriers not only to stop filing tariffs with the Commission in the future, but to cancel their tariffs then on file. A panel of this court struck down the *Sixth Report and Order*'s obligatory detariffing policy, holding that section 203(a)'s command that "[e]very common carrier . . . shall . . . file" tariffs was mandatory, and that the modification authority under Section 203(b) "suggest[ed] circumscribed alterations—not, as the FCC now would have it, wholesale abandonment or elimination of a requirement." *MCI v. FCC,* 765 F.2d 1186, 1191, 1192 (D.C.Cir.1985).

MCI continued negotiating rates for some services and not filing tariffs with the FCC pursuant to the permissive detariffing policy of the *Fourth Report and Order,* and in 1989, AT & T filed a complaint alleging that the unfiled rates violated Section 203(a) and (c). Two-and-one-half years later the Commission dismissed AT & T's complaint and stated that it would address AT & T's contention that the rule was *ultra vires* in a proposed rulemaking. *AT & T Communications v. MCI,* 7 F.C.C.R. 807 (1992); *see also Tariff Filing Requirements for Interstate Common Carriers, Notice of Proposed Rulemaking,* 7 F.C.C.R. 804 (1992). AT & T petitioned this court for review, and a panel found that the FCC wrongly declined to address its authority to promulgate a permissive detariffing policy and decided that the *Fourth Report and Order* was rendered indefensible by the *MCI v. FCC* decision. *AT & T v. FCC,* 978 F.2d 727, 733–34 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993). The court stated that, "[w]hether detariffing is made mandatory, as in the *Sixth Report,* or simply permissive, as in the *Fourth Report,* carriers are, in either event, relieved of the obligation to file tariffs under section 203(a). That step exceeds the limited authority granted the Commission in section 203(b) to 'modify' requirements of the Act." *Id.* at 736 (footnote omitted).

Less than two weeks after that decision, the Commission completed its rulemaking proceeding commenced in response to AT & T's complaint, releasing a report and order

that essentially affirmed its permissive detariffing policy as a valid use of its modification authority under section 203(b). *Tariff Filing Requirements for Interstate Common Carriers,* 7 F.C.C.R. 8072 (1992), *stayed pending further notice,* 7 F.C.C.R. 7989 (1992). AT & T filed a motion for summary reversal with this court and a panel granted the motion in an unpublished *per curiam* order, stating that, "[t]he decision of this court in [*AT & T v. FCC* ] conclusively determined that the FCC's authorization of permissive detariffing violates section 203(a) of the Communications Act." *AT & T v. FCC,* No. 92–1628, 1993 WL 260778 (June 4, 1993) (*per curiam* ). The Supreme Court granted *certiorari* and affirmed the court of appeals's order, finding that the Commission's modification authority was very limited and it certainly did not allow the FCC to disregard Congress's mandates in the Communications Act. *MCI v. AT & T,* —— U.S. at ——, 114 S.Ct. at 2231–33.

## C.  *The Range Tariff Proceedings*

More than one year before the Supreme Court's decision, the FCC initiated yet another rulemaking proceeding to consider again how to relax the rate-filing requirements for nondominant common carriers. *Tariff Filing Requirements for Nondominant Common Carriers, Notice of Proposed Rulemaking,* 8 F.C.C.R. 1395 (1993). After receiving commentary from several parties, the FCC released a memorandum opinion and order, adopting a rule that permitted nondominant carriers to file a "reasonable range of rates" rather than "a fixed rate." *Range Tariff Order,* 8 F.C.C.R. at 6752. The Commission reasoned, as it had in its previous efforts to relax the tariff-filing requirement for non-dominant carriers, that

traditional tariff regulation of nondominant carriers is not only unnecessary to ensure just and reasonable rates, but is actually counterproductive since it can inhibit price competition, service innovation, entry into the market, and the ability of carriers to respond quickly to market trends.

*Id.* (citing *Second Report and Order,* 91 F.C.C.2d at 62, 65, 71; *Further Notice of Proposed Rulemaking,* 84 F.C.C.2d 445, 453,

456, 471, 479 (1981)). The FCC found that the Communications Act supported its decision: range tariffs would satisfy section 203(a) because the public could "discern, by examining the tariff filing, the reasonable zone of rates within which the customers would be charged" and section 203(b) allowed the Commission "to modify the specific content requirements of tariffs." *Range Tariff Order,* 8 F.C.C.R. at 6759.

## II.  DISCUSSION

This case primarily turns on one fundamental notion: Congress enacted the Communications Act and the mandates of the Act are not open to change by the Commission or the courts. If the Commission believes those mandates inadequate to the task of regulating the telecommunications industry in light of changed circumstances, the Commission must take its case to Congress. The Commission may not, instead, ignore congressional directives because it believes "traditional tariff regulation" is "unnecessary" and "counterproductive." Justice Scalia made this point most recently in *MCI v. AT & T:*

[O]ur estimations, and the Commission's estimations, of desirable policy cannot alter the meaning of the Federal Communications Act of 1934. For better or worse, the Act establishes a rate-regulation, filed-tariff system for common-carrier communications, and the Commission's desire "to 'increase competition' cannot provide [it] authority to alter the well-established statutory filed rate requirements," . . . . "[S]uch considerations address themselves to Congress, not to the courts."

—— U.S. at ——, 114 S.Ct. at 2233 (citations and internal quotations omitted).

The parties in this case spent great effort debating "good economic policy," imperfect versus perfect markets, and imperfect versus perfect knowledge. *See, e.g.,* Brief for Respondents at 23 (suggesting that the FCC can still enforce the nondiscriminatory provisions because carriers without market power cannot rationally charge excessive rates or discriminate among customers); Tr. of Oral Argument at 14–17. The Supreme Court heard similar arguments in *MCI v. AT & T,* noting that "there is considerable 'debate in

other forums about the wisdom of the filed rate doctrine,' ... and, more broadly, about the value of continued regulation of the telecommunications industry." —— U.S. at ——, 114 S.Ct. at 2233 (quoting *Security Servs., Inc. v. Kmart Corp.,* —— U.S. ——, ——, 114 S.Ct. 1702, 1708, 128 L.Ed.2d 433 (1994)). While certain of these arguments may make sense as a matter of economic policy, they are ultimately irrelevant.[1]

In fact, we entertained and dismissed the same economic arguments in 1985. The Commission contended that the *Sixth Report and Order,* requiring all nondominant carriers to refrain from filing tariffs with the FCC, was a rational regulatory reduction because "competitive marketplace forces in almost all cases will be sufficient to assure just and reasonable rates." *MCI v. FCC,* 765 F.2d at 1194 (quoting Brief for Respondents at 51). In that case, the panel explained that Congress had not given the FCC any new instructions.

> In enacting Sections 203–05 of the Communications Act, Congress intended a specific scheme for carrier initiated rate revisions. A balance was achieved after a careful compromise. The Commission is not free to circumvent or ignore that balance. Nor may the Commission in effect rewrite this statutory scheme on the basis of its own conception of the equities of a particular situation.

*Id.* at 1195 (quoting *AT & T v. FCC,* 487 F.2d 865, 880 (2d Cir.1973)). The panel concluded, "[h]owever reasonable the Commission's assessment, we are not at liberty to release the agency from the tie that binds it to the text Congress enacted." *Id.* at 1194. We reach the same conclusion here: we find the Commission is still bound to the text Congress enacted.

## A. Section 203(a)

■ We hold that section 203(a)'s mandate that every common carrier file "*schedules showing all charges*" does not permit the FCC to allow some common carriers to file a range of charges. First, the clear and definite language of the rate-filing provision does not encompass the concept of ranges. Second, the Supreme Court's and this court's interpretations of parallel provisions in the Interstate Commerce Act ("ICA") suggest that the Communication Act's rate-filing provision does not allow common carriers to file ranges of rates. Third, the Supreme Court's recent opinion in *MCI v. AT & T,* while primarily focused on the FCC's limited modification authority under section 203(b), supports our conclusion that only Congress, not the Commission, may change the requirements of the Communications Act. *See* —— U.S. at ——, 114 S.Ct. at 2229–33.

### 1. The Language of Section 203(a)

We begin our analysis by examining the language of the statute. *See MCI v. FCC,* 765 F.2d at 1191 ("[T]he starting point for interpreting a statute is the language of the statute itself.") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). Section 203(a) of the Communications Act provides:

> (a) Filing; public display.

> Every common carrier, except connecting carriers, shall, within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection *schedules showing all charges* ..., whether such charges are joint or separate, and showing the classifications, practices, and regulations affecting such charges....

47 U.S.C. § 203(a) (emphasis added).

The chosen title for section 203(a)—"filing; public display"—suggests that Congress wanted the rates to be filed such that they may be known to the public. Congress did not have to include the concepts of both filing

---

**1.** The Supreme Court suggested that it had sympathy with the Commission's economic arguments—specifically, that the filing costs now raise artificial barriers to entry and that the publication of rates facilitates parallel pricing and stifles price competition—though the Court doubted the rationales made sense because dominant carriers are most likely to be price leaders. *MCI v. AT & T,* —— U.S. at ——, 114 S.Ct. at 2233. Regardless of how convincing the Commission's policy rationales may be, the Commission is without authority to alter congressional mandates.

and public display, but their joint appearance, offered to describe the provision, signals that Congress intended common carriers to file rates for public inspection. A range of rates simply does not cater to public knowledge because the public cannot discern the actual rate proposed to be charged by non-dominant carriers.

The language of the provision itself puts lingering doubts to rest. The first part of section 203(a), stating that "[e]very common carrier ... shall ... file," suggests that the filing requirement applies to all common carriers and that the requirement is mandatory. As we noted in *MCI v. FCC*, the Supreme Court has found "[s]hall" to be "the language of command." 765 F.2d at 1191 (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935)). Section 203(a) then lays out what kind of filing the statute requires: "schedules showing all charges." This language connotes a specific list of discernable rates; it does not admit the concept of ranges. The provision also requires common carriers to file schedules "showing the classifications, practices, and regulations affecting such charges," which underscores the level of definition section 203(a) requires. Simply put, a range of possible rates and a "schedule[ ] showing all charges" would appear to be mutually exclusive concepts, unless the range is zero. Finally, the language of section 203(c) [2] also supports our finding. Section 203(c) forbids common carriers to charge other than "the charges specified in the schedule," the enforcement of which depends entirely on rates being discernable. In short, the language of section 203 does not allow the relaxed tariff filing measures adopted in the *Range Tariff Order*.

■ The FCC argues that this court should uphold an agency's reasonable interpretation of a statute when it does not contain the unambiguously expressed intent of Congress on the precise question at issue. *See National R.R. Passenger Corp. v. Boston & Maine Corp.*, —— U.S. ——, ——, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992) (finding "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute") (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). The Commission contends that Congress has not defined "schedules" anywhere in the Act and therefore this court should defer to the FCC's reasonable decision to permit carriers to file ranges of rates. However, as the Supreme Court stated in *MCI v. AT & T*, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." —— U.S. at ——, 114 S.Ct. at 2231 (citing *Pittston Coal Group v. Sebben*, 488 U.S. 105, 113, 109 S.Ct. 414, 419–20, 102 L.Ed.2d 408 (1988)). Here, the Commission has taken the word "schedules" [3] out of context. Section 203(a) requires the filing of "schedules showing all charges," which clearly suggests something more definite and specific than rate ranges. The FCC contends that elsewhere in the Act, Congress employed the concept of ranges. The Commission notes that under section 205(a) (the provision under which the Commission may

---

**2.** Section 203(c) reads:

No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication ... than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or

practices affecting such charges, except as specified in such schedule.
47 U.S.C. § 203(c) (1988).

**3.** Several dictionary definitions of "schedules" employ the concept of a statement of details. *See, e.g.* RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1713 (2d ed. 1987) ("a written or printed statement of details"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2028 (1976) ("an appended statement of supplementary details usu[ally] accompanying a legal ... document"); BLACK'S LAW DICTIONARY 1344 (6th ed. 1990) ("[a] sheet of paper annexed to a[n] ... instrument, exhibiting in detail the matters mentioned or referred to in the principal document").

prescribe charges for violators), the FCC may set either fixed rates or ranges of rates defined by "the maximum or minimum, or maximum and minimum, charge or charges." 47 U.S.C. § 205(a) (1988). The agency fails to realize that Congress's expressed allowance of a range of charges in section 205(a) shows that had it envisioned the filing of ranges of rates in section 203(a), it would have included such language. Section 203(a) might have stated, for example, "schedules showing all charges or maximum and minimum charges." Instead, Congress required schedules showing all charges in section 203(a). We find that the Commission has again misread the clear congressional mandate in section 203(a).

### 2. Filed Rate Provisions of the ICA

Our interpretation of section 203(a) of the Communications Act finds support in judicial interpretations of parallel provisions of the Interstate Commerce Act, 49 U.S.C. §§ 10761–10762 (1988). Because the Communications Act and the Interstate Commerce Act share a common ancestor, the original Interstate Commerce Act, courts have considered interpretations of one of the modern statutes instructive in judicial construction of the other. *See AT & T v. FCC,* 978 F.2d at 736 n. 12; *MCI v. FCC,* 917 F.2d 30, 38 (D.C.Cir.1990) (finding Communications Act based upon ICA and therefore that it must be read in conjunction with ICA); *American Broadcasting Co., Inc. v. FCC,* 643 F.2d 818, 820–21 (D.C.Cir.1980) (finding that to understand the Communications Act, courts must look to ICA from which Communications Act borrowed its language and purpose). Two ICA cases, *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), and *Regular Common Carrier Conference v. United States,* 793 F.2d 376 (D.C.Cir.1986), buttress our interpretation of the rate-filing provision. In striking down the Interstate Commerce Commission's ("ICC") attempts to deregulate the tariff-filing requirements in the ICA context, the opinions dwell on two points we find instructive in this case. First, the courts reason that the rate-filing provision is central to the ICA. Second, the courts explain that the FCC has a duty to prohibit carriers from deviating from those rates, which would be frustrated were carriers permitted to escape the tariff-filing requirements.

*Maislin Industries* involved an ICC policy permitting carriers to negotiate rates different from those filed. Section 10762, the rate-filing provision of the ICA, however, requires motor common carriers to file their rates with the ICC, and section 10761 prohibits carriers from deviating from those rates. 49 U.S.C. §§ 10761, 10762. The Supreme Court found that the ICC's *Negotiated Rates* decisions misinterpreted the rate-filing provision of the ICA. Although the ICC, like the FCC in the case at bar, had argued that its policy did not "abolis[h] the requirement in section 10761 that carriers must continue to charge the tariff rate," *id.* 497 U.S. at 132, 110 S.Ct. at 2769 (quoting App. to Pet. for Cert. 36a), the Court responded that "the policy, by sanctioning adherence to unfiled rates, undermines the basic structure of the Act," *id.* Compliance with the rate-filing provision, it found, was " 'utterly central' to the administration of the Act." *Id.* (quoting *Regular Common Carrier,* 793 F.2d at 379). The Court reasoned: "[i]f the rates are subject to secret alteration by special agreement then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart." *Id.* at 130, 110 S.Ct. at 2768 (quoting *Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908)). The Supreme Court also suggested that the ICC's duty to prohibit carriers from deviating from their filed rates may be frustrated. It stated, "[t]he duty to file rates with the Commission, *see* § 10762, and the obligation to charge only those rates, *see* § 10761, have always been considered essential to preventing price discrimination and stabilizing rates." [4] *Id.* at 126, 110 S.Ct. at 2766.

---

4. In a subsequent decision, the Supreme Court held that "[t]rustees in bankruptcy and debtors in possession may rely on the filed rate doctrine to collect for undercharges," citing *Maislin Industries,* "but they may not collect for undercharges based on filed, but void, rates." *Security*

In *Regular Common Carrier,* this court considered an ICC *Average Rates* rule, allowing carriers to provide services at unpublished rates determined by averaging prior charges to those shippers. The statutory provision provided that carriers "shall provide ... service only if the rate ... is contained in a tariff," 49 U.S.C. § 10761(a), which then-judge Scalia found "utterly central to the Act." 793 F.2d at 379. "Without it," the court reasoned, "it would be monumentally difficult to enforce the requirement that rates be reasonable and nondiscriminatory ... and virtually impossible for the public to assert its right to challenge the lawfulness of existing or proposed rates." *Id.* (citations omitted).

Like the *Negotiated Rates* and *Average Rates* policies of the ICC, the *Range Tariff Order* allows some common carriers to avoid filing readily ascertainable rates with the Commission. Like the rate-filing provision of the ICA, section 203(a) is a central component of Congress's regulatory scheme for common carriers. As the *Negotiated Rates* and *Average Rates* policies of the ICC made enforcement of the nondiscriminatory provisions of the ICA more difficult, so too, would the *Range Tariff Order* frustrate the enforcement provisions of the Communications Act.[5]

In fact, this court employed reasoning similar to the ICA cases in our 1985 *MCI v. FCC* decision, finding that rate filing was utterly central to title II's regulatory scheme and that the FCC would find it difficult to enforce the reasonable and nondiscriminatory rate provisions without readily discernable rates. We noted that, at least before 1980, the Commission shared the judicial perception of the statutory tariff-filing requirement for common carriers. Shortly after the Commission initiated the *Common Carrier* proceedings, it stated:

There can be no question that tariffs are essential to the entire administrative scheme of the Act. They serve as a kind of "tripwire" enabling the Commission to monitor the activities of carriers subject to its jurisdiction and to thereby insure that the charges, practices, classifications, and regulations of those carriers are just, reasonable, and nondiscriminatory.... The importance of tariffs and the requirement that common carriers—all common carriers—must offer all of their communications services to the public through published tariffs is well established. *See Armour Packing Co. v. United States,* 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908).

765 F.2d at 1192–93 (quoting *Western Union Telegraph Co.,* 75 F.C.C.2d 461, 474 (1980) (emphasis omitted)). In *MCI v. FCC,* this court noted that the FCC has a duty to "execute and enforce the provisions" of the Communications Act under section 151, 47 U.S.C. § 151 (1988), and that the Act requires "that carriers file their tariffs with the FCC" under section 203(a) and "that rates and practices be just, fair, reasonable and nondiscriminatory," under sections 201(b) and 202(a). 765 F.2d at 1192 (quoting *AT & T v. FCC,* 572 F.2d 17, 25 (2d Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978) (emphasis omitted)). Under the proposed scheme at issue here, ensuring that rates are reasonable and nondiscriminatory would prove difficult if not impossible without definite rates filed.

### 3. Supreme Court's Interpretation of Section 203(a)

While the Supreme Court's recent opinion in *MCI v. AT & T* primarily focused on the FCC's modification authority under section 203(b), the Court did expound upon the two points made in its ICA decisions that are

*Servs., Inc. v. Kmart Corp.,* —— U.S. at ——, 114 S.Ct. at 1710. The Court's decision in *Kmart* does not undermine the importance of the rate-filing provisions in the ICA. *See, e.g., Kmart,* —— U.S. at ——, 114 S.Ct. at 1706–08 (citing favorably the findings in *Maislin Industries* ).

**5.** We recognize that Congress has since modified the rate-filing provision of the ICA to allow for "range tariffs" which "identify the specific rate or discount from among the range of rates or discounts" contained in the tariff "applicable to each specific shipment" or containing "an objective means for determining the rate." 49 U.S.C. § 10762(i) (Supp. V 1993); *see* notes 8–9 *infra* and accompanying text. Thus, it is not clear whether the ICA's rate-filing scheme is still comparable to the Communications Act's rate-filing scheme.

relevant to this case. First, the Court found that section 203(a) is at the center of the common carrier provisions and, second, the Court found that the agency's detariffing orders undermined section 203(a) and would therefore frustrate complaint proceedings. The Court also added a third and crucial point to its discussion, acknowledging that while there may be other means to achieve the same ends, Congress chose the present system. And until Congress changes the statute, the agency and the courts must abide by it.

Justice Scalia described the importance of section 203(a): "The tariff-filing requirement is ... the heart of the common-carrier section of the Communications Act." *MCI v. AT & T*, —— U.S. at ——, 114 S.Ct. at 2231. The Court quoted *Maislin Industries*'s conclusion that compliance with the rate-filing provision "is 'utterly central' to the administration of the Act." *Id.* (quoting *Maislin Industries*, 497 U.S. at 132, 110 S.Ct. at 2769 (quoting *Regular Common Carrier*, 793 F.2d at 379)). The Court found that "[m]uch of the rest of the Communications Act subchapter applicable to Common Carriers, see 47 U.S.C. §§ 201–228, and the Act's Procedural and Administrative Provisions, 47 U.S.C. §§ 401–416, are premised upon the tariff-filing requirement of § 203." *Id.* A brief look at the structure of title II of the Act illustrates the centrality of the rate-filing provision.[6]

Section 201 requires common carriers to "furnish ... communication service upon reasonable request therefor" and mandates that their "charges, practices, classifications, and regulations" be "just and reasonable." 47 U.S.C. §§ 201(a), (b). Section 202 forbids carriers to "make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services ... or give any undue or unreasonable preference or advantage to any particular person,

class of persons, or locality." *Id.* § 202(a). Upon complaint or on its own initiative, the Commission may hold hearings and declare unlawful proposed rate increases under section 204, and upon a finding that a common carrier's actual or proposed charges are in violation of the provisions, may prescribe the "just and reasonable charge" or a range of charges pursuant to section 205. *Id.* §§ 204–205. Sections 206 and 207 give persons damaged by a common carrier's violation of the statute a right to damages, *id.* §§ 206–207, and section 208 gives such persons the right to file a complaint with the Commission, *id.* § 208. Section 203(a), the rate-filing provision, is the provision on which these other provisions depend. Compliance with section 203(a) is crucial to the effective enforcement of the reasonable and nondiscriminatory provisions.

■ While there may be other methods to ensure that common carriers meet the commands of title II, the Court recognized that "rate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges." *MCI v. AT & T*, —— U.S. at ——, 114 S.Ct. at 2231. Undermining the rate-filing provisions by allowing some common carriers to file ranges of rates would frustrate the complaint proceedings, as conceived by Congress. *Id.* This is not to say that the *Range Tariff Order* would frustrate the broader purposes of the Act. As the Supreme Court made clear in *MCI v. AT & T*,

> We simply say, as did the *Maislin* Court, that eliminating the tariff-filing requirement would frustrate complaint proceedings; not that eliminating those requirements, or indeed even eliminating the complaint proceedings, would frustrate the ultimate purposes of the Act. Perhaps, as the dissent asserts, it would not; perhaps even eliminating the FCC would not do so.

---

**6.** The Supreme Court referenced the ICA decisions in explaining the importance of the rate-filing provision to the Commission's ability to enforce the other provisions. "The duty to file rates with the Commission, [the analog to § 203(a)], and the obligation to charge only those rates, [the analog to § 203(c)], have always been considered essential to preventing price discrimination and stabilizing rates." *MCI v. AT &*

*T*, —— U.S. at ——, 114 S.Ct. at 2231 (quoting *Maislin Industries*, 497 U.S. at 126, 110 S.Ct. at 2766; *see also Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 384, 52 S.Ct. 183, 185, 76 L.Ed. 348 (1932) (filing requirements "render rates definite and certain, and ... prevent discrimination and other abuses")).

But we (and the FCC) are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.

*Id.* at ———— n. 4, 114 S.Ct. at 2231–32 n. 4. Congress is free to select the remedial tools it deems appropriate; it decided to require common carriers to file "schedules showing all charges" not ranges of rates. The FCC cannot abandon the legislative scheme because it thinks it has a better idea.[7]

Our opinion is only underscored by Congress's recent enactment of the Negotiated Rates Act of 1993 amending the ICA. Pub.L. No. 103–180, 107 Stat. 2044 (codified at 49 U.S.C. §§ 10701–11901) (Supp. V 1993). While the Act primarily establishes procedures for resolving claims involving unfiled, negotiated transportation rates, it also includes a provision entitled "Range Tariffs."

49 U.S.C. § 10762(i) (Supp. V 1993). This subsection expressly allows tariffs based on a "range of rates or discounts for specific classes of shipments" and establishes the matters that must be identified in tariffs filed pursuant to the enactment.[8] *Id.* Should the FCC wish to achieve a similar result for nondominant common carriers under the Communications Act, the Commission must seek congressional action to amend the common carrier section of the Communications Act.[9] It would be ironic indeed—given the historically parallel lines of enforcement under the ICA and the Communications Act—for the FCC to achieve by agency rule that which the ICC could not achieve except through congressional action.

We have not said a great deal that is new. Our previous decisions clearly indicate that this court is not the forum in which to change

7. Our opinion in this case disposes of Southwestern Bell Corporation's ("Southwestern") claim that the FCC should reconsider the dominant/nondominant carrier distinction, because its claim presently hinges on the misperception that the FCC has statutory authority to adopt the *Range Tariff Order.* Any subsequent agency rules that attempt to apply this dominant/nondominant distinction may give rise to Southwestern's claim and may provide a more appropriate context in which to consider it.

8. That provision provides:
Range Tariffs.—No tariff filed by a motor carrier of property with the Commission before, on, or after the date of the enactment of this subsection may be held invalid solely on the basis that the tariff does not show a specific rate or discount for a specific shipment if the tariff is based on a range of rates or discounts for specific classes of shipments. For transportation performed on or after the 180th day following such date of enactment, such a range tariff must identify the specific rate or discount from among the range of rates or discounts contained in such range tariff which is applicable to each specific shipment or must contain an objective means for determining the rate. 49 U.S.C. § 10762(i).

9. The Negotiated Rates Act of 1993, enacted on December 3, 1993, was first introduced in 1990, largely in response to the result in the Supreme Court's 1990 *Maislin Industries* decision. *See* 136 Cong. Rec. S11,000 (daily ed. July 27, 1990) (statement of Sen. Exon); *see also* 139 Cong. Rec S16,186 (daily ed. Nov. 18, 1993) (statement of Sen. Hollings). In fact, less than a month after the Court's decision, the Surface Transportation Subcommittee considered what it later termed

the "undercharge crisis"—trustees of bankrupt carriers were pursuing filed rates when the carriers had received payment under negotiated rates—and invited then-ICC chairman Edward Philbin to testify. *See* 136 Cong. Rec. S11,000 (daily ed. July 27, 1990) (statement of Sen. Exon). The hearing testimony convinced the committee to conclude that legislation was necessary to eliminate what it perceived to be an inequitable situation. *Id.* Legislation introduced by Senator Exon essentially allowed the ICC to consider the equities associated with negotiated, but unfiled, tariff rates. *See id.; see also* S2933, 101st Cong., 2d Sess. (1990). The bill was approved by the Commerce Committee but was not cleared for floor action before the 101st Congress adjourned. *See* 138 Cong. Rec. S15,796 (daily ed. Sept. 30, 1992) (statement of Sen. Kasten). The following year the House again failed to consider the bill prior to adjournment. *See* 139 Cong. Rec. S58,572 (daily ed. July 1, 1993) (statement of Sen. Hollings).

In 1993, the bill was introduced in both houses with new provisions, including the Range Tariff provision. *See* 139 Cong. Rec. S16,185, S16,186 (daily ed. Nov. 18, 1993) (statement of Sen. Hollings); 139 Cong. Rec. H9595, H9602 (daily ed. Nov. 15, 1993) (statement of Rep. Mineta) (provisions in effort to "clarif[y] the legality and future requirements with regard to certain other fare practices—such as range rates, contract rates, and coded rates—so that these practices are not allowed to fester as an enormous source of contention as negotiated rates have"). Perhaps Congress will realize a need for range tariffs in the Communications Act. It is not our role, however, to forecast congressional action; we simply interpret the statute before us.

congressional mandates. In *MCI v. FCC*, we concluded, "if the Commission is to have authority to command that common carriers not file tariffs, the authorization must come from Congress, not from this court or from the Commission's own conception of how the statute should be rewritten in light of changed circumstances." 765 F.2d at 1195. Seven years later, in *AT & T v. FCC*, we pointed the FCC in the same direction, stating, "[t]he Commission will have to obtain congressional sanction for its desired policy course." 978 F.2d at 736. Again, we find that it is Congress the Commission must persuade, not this court.

### B. Section 203(b)

We are similarly unpersuaded by the Commission's alternative argument, that its modification authority under section 203(b) of the Communications Act allows it to change the requirements of that section. Section 203(b) provides:

> The Commission may, in its discretion and for good cause shown, modify any requirement made by or under the authority of this section either in particular instances or by general order applicable to special circumstances or conditions except that the Commission may not require the notice period specified in paragraph (1) to be more than one hundred and twenty days.

47 U.S.C. § 203(b)(2). In 1985, we found that this language, allowing the Commission to "modify . . . in particular instances or by general order applicable to special circumstances," suggests "circumscribed alterations" instead of "wholesale abandonment . . . of a requirement." *MCI v. FCC*, 765 F.2d at 1192. We find that the FCC's authority to modify does not allow it to abandon section 203(a)'s requirement that all common carriers file "schedules showing all charges."

The Supreme Court's recent decision in *MCI v. AT & T* largely disposes of the FCC's argument on this point. The Court interpreted section 203(b) to confer on the Commission a very limited authority to modify. The Court's decision was partially based on the meaning of the word "modify," connoting change by increment. —— U.S. at ——, 114 S.Ct. at 2229 ("Virtually every dictionary we

are aware of says that 'to modify' means to change moderately or in minor fashion.") (citing RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1236 (2d ed. 1987); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1452 (1976); 9 OXFORD ENGLISH DICTIONARY 952 (2d ed. 1989); BLACK'S LAW DICTIONARY 1004 (6th ed. 1990)). The Supreme Court also based its decision on an assessment of the importance of the provision the Commission sought to modify. Because rate filings are "the essential characteristics of a rate-regulated industry," the Court reasoned, "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." —— U.S. at ——, 114 S.Ct. at 2232. We find that the *Range Tariff Order* clearly goes beyond the kinds of modest modifications the Commission may make under section 203(b)(2). The *Range Tariff Order* effectively introduces a different regime of regulation—one based on ranges of rates as opposed to discernable rates—which may or may not be a better regime, but is not the one that Congress established.

### III. CONCLUSION

◼ We find that the Commission's *Range Tariff Order* violates the clear requirement of section 203(a) that "[e]very common carrier . . . shall . . . file . . . schedules showing all charges." We further find that the Commission does not have the authority under section 203(b) to modify the requirements of section 203(a), allowing nondominant common carriers to file ranges of rates. Accordingly, we grant the petition for review and vacate the *Range Tariff Order.*

*So ordered.*

SILBERMAN, Circuit Judge, concurring:

I completely agree with the majority's analysis and join the opinion. I am nevertheless *dubitante* not because of any concern as to its reasoning or its reading of *MCI Telecommunications Corp. v. American Tel. & Tel. Co.*, —— U.S. ——, 114 S.Ct. 2223, 129

L.Ed.2d 182 (1994), but rather because I simply cannot square the Court's treatment of statutory filed rate provisions in *MCI* and *Maislin Industries, U.S. v. Primary Steel,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) with *Security Servs. v. Kmart Corp.,* — U.S. ——, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994). *See Maislin,* 497 U.S. at 121, 110 S.Ct. at 2763. It is rather obvious that a number of justices are not comfortable with the hard logic of *Maislin,* requiring adherence to filed rates and invalidating inconsistent negotiated rates; Justice Stevens is rather persistent in his disapproval of that opinion. *see Kmart,* — U.S. at ——, 114 S.Ct. at 1710 (Stevens, J. concurring). And the dissenters along with Justice Stevens in *MCI* apparently wish to apply the reasoning of *Maislin* flexibly to the telecommunications industry, relaxing the filed rate doctrine to allow the agency free pursuit of desirable policy goals. *See MCI,* — U.S. at ——, 114 S.Ct. at 2234.

The real difficulty, however, is the majority opinion in *Kmart.* I quite agree with Justice Ginsburg that "[i]t is difficult to regard the Commissioner's approach, and the Court's approval of it, as anything other than an end-run around the filed rate doctrine so recently and firmly upheld in *Maislin.*" *Kmart,* — U.S. at ——, 114 S.Ct. at 1717 (Ginsburg, J. dissenting). The ICC, obviously distressed with *Maislin*—which permitted a trustee of a bankrupt carrier to insist on recovering the filed rate against a shipper even if the carrier had negotiated a lower rate with that shipper—came up with a gimmick to get around that case. The Commission fortuitously discovered that over 40% of all carriers whose tariffs referred to Mileage Guides published by a Household Goods Carriers' Bureau (HGCB) had neglected to keep a current "power of attorney" on file with the Bureau or had failed to pay a nominal fee to the Bureau. The Commission's void for "non-participation" regulation stated that "[a]bsent effective concurrences or powers of attorneys, tariffs are void as a matter of law." 49 C.F.R. § 1312.4(d) (1993). Accordingly, the Commission held that a carrier in that position no longer had an "effective" tariff on file even though there could be no *real* doubt as to the rate or mileage of the carrier's tariffs. If a power of attorney had lapsed, the tariff became ineffective even though the technical defect went entirely unnoticed at the time of filing or lapse. The Court upheld this invalidation of filed tariffs, describing the filed rates as "lack[ing] an essential element" and insufficient "to support a reliable calculation of charges." *See Kmart,* — U.S. at ——, 114 S.Ct. at 1708, 1710.

That interpretation of the Commission's regulation and its application to tariffs thought by both carriers and shippers to be effective was, as both Justice Thomas and Justice Ginsburg pointed out, in contravention of the Court's prior opinion, *ICC v. American Trucking Assoc.,* 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984). In that case the Court had held that the Commission could not under most circumstances as part of its statutory authority to "reject" filed tariffs *reach back* and "invalidate tariffs that it had accepted for filing without objection." *Overland Express v. ICC,* 996 F.2d 356, 359 (D.C.Cir.1993), *vacated and remanded,* — U.S. ——, 114 S.Ct. 2095, 128 L.Ed.2d 658 (1994). The majority in *Kmart,* however, stated that the Commission had not really acted "retroactively," as it had in *American Trucking* because the tariff became invalid only after the power of attorney lapsed in accordance with the pre-existing nonparticipation rule. *See Kmart,* — U.S. at ——, 114 S.Ct. at 1709. Yet *American Trucking* did not bar retroactive rulemaking or deal with retroactivity in its classic sense, *see Georgetown University Hosp. v. Bowen,* 862 F.2d 323 (D.C.Cir.1988) (*Georgetown II*). It prevented the Commission from second-guessing the validity of an existing tariff as the basis for shipping charges long after it had been published except under limited circumstances (*i.e.,* in furtherance of a specific statutory mandate). *See American Trucking,* 467 U.S. at 362–64, 367, 104 S.Ct. at 2463–64, 2465. In *American Trucking* the Commission invalidated a published tariff because it was thought to be the product of unauthorized collusive activity. The Court examined the Commission's action under this strict standard (and, incidentally, approved it in that case), but according to the logic of *Kmart,* the Commission could just as easily have held that a tariff stemming from such a

process was ineffective *ab initio* and therefore did not implicate the filed rate doctrine or notions of retroactivity.

The Court in *Kmart* analogized the Commission's interpretation of its non-participation regulation with the supposed parallel treatment of an expiration date on a tariff. *See Kmart,* —— U.S. at ——, 114 S.Ct. at 1709. With all due respect, that analogy is rather tenuous. When a carrier puts an expiration date on his tariff, he indicates quite clearly that he will no longer charge that rate after the expiration date, and the shipper will certainly take notice of that fact. The difficulty with the ICC's application of the non-participation regulation is that the Commission relied on a latent procedural defect that typically would have been overlooked to invalidate entirely the published tariff, thus avoiding the consequences of *Maislin.*

Since the reasoning of the *Kmart* opinion is so unpersuasive, I am inclined to believe that Justice Ginsburg's explanation regarding the Court's circumvention of *Maislin* is correct. Therefore I lack confidence that the Court will adhere to the logic of *Maislin* and *MCI* when again faced with consequences that appear undesirable *ex post.*