**SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

AT&T Corporation, et al., Intervenors.

No. 95–1592.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1996.

Decided Nov. 26, 1996.

Mark L. Evans argued the cause for petitioner, with whom Sean A. Lev, Washington, DC, Robert M. Lynch, Durward D. Dupre, and Thomas A. Pajda, St. Louis, MO, were on the briefs.

Laurel R. Bergold, Counsel, Federal Communications Commission, argued the cause for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy Associate General Counsel, Anne K. Bingaman, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson

and Robert J. Wiggers, Attorneys, were on the brief.

Gene C. Schaerr, Washington, DC, argued the cause for intervenor, with whom Richard J. Metzger, Arlington, VA, was on the brief. Mark C. Rosenblum, Baskenridge, NJ, Peter D. Keisler, Donald J. Elardo, and Frank W. Krogh, Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge, SILBERMAN and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Southwestern Bell Telephone Company petitions for review of an order of the Federal Communications Commission holding a Southwestern Bell tariff amendment unlawful. In its tariff amendment, Southwestern Bell sought the ability to deviate from geographically averaged rates otherwise required by Commission regulations in response to a customer's request for proposal to provide access services. Since the Commission did not adequately explain the application of the competitive necessity doctrine in this context, and since the other reasons it articulated do not independently support its decision, we remand.

## I.

In order for long-distance phone companies such as AT&T or MCI, known as interexchange carriers, to transmit long-distance telephone calls, they must connect their customers' telephones to entry points, or "points of presence," on their interchange network. Local phone companies such as Southwestern Bell, known as local exchange carriers (LECs), receive a fee for providing interexchange carriers with access to their customers. *See generally Competitive Telecomm. Ass'n v. FCC,* 87 F.3d 522, 524–25 (D.C.Cir. 1996). At one time, LECs were the exclusive providers of these access services. Increasingly, however, competitive access providers (CAPs) have begun to compete with LECs by providing alternative methods of access between customers and interexchange carri-

ers. *See Bell Atlantic Tel. Cos. v. FCC,* 24 F.3d 1441, 1443 (D.C.Cir.1994).

Under Commission regulations designed to encourage cost savings and competition in the local access industry, the rates charged by LECs—which are designated by the Commission as "dominant" carriers in the local exchange markets because they control essential communications facilities—to interexchange carriers are presumed lawful and qualify for the Commission's streamlined review process only if they fall at or below "price caps" and within "pricing bands." Price caps are designed to give LECs greater flexibility in setting rates while protecting ratepayers from exorbitant rates, *see Policy and Rules Concerning Rates for Dominant Carriers,* 5 F.C.C. Rcd. 6786, 6788 (1990), *modified on recon.,* 6 F.C.C. Rcd. 2637 (1991), *aff'd, National Rural Telecom Ass'n v. FCC,* 988 F.2d 174 (D.C.Cir.1993), and pricing bands are designed to prevent predatory pricing, *Price Cap Performance Review for Local Exchange Carriers,* 10 F.C.C. Rcd. 8961, 9130 (1995), *aff'd, Bell Atlantic Tel. Cos. v. FCC,* 79 F.3d 1195 (D.C.Cir.1996). Of particular importance here, under the Commission's interpretation of the Communications Act's prohibition on unreasonable price discrimination, *see* 47 U.S.C. § 202(a) (1994), within that range, LECs are also required to charge the same "averaged" rates to all interexchange carriers within specified areas, 47 C.F.R. § 69.3(e)(7) (1995), which are determined either by geography ("study areas") or, in certain instances, by traffic density. Thus, unless they qualify for an exception, LECs such as Southwestern Bell are precluded from tailoring rates to specific customers. In contrast, CAPs—which are designated as "nondominant" carriers because they lack market power—are not subject to these requirements and thus have greater flexibility in determining the price to be offered any particular interexchange carrier.

■ In response to two MCI "requests for proposals" soliciting bids to provide access services to MCI points of presence in two study areas, Southwestern Bell filed an amendment to its public tariff which sought to offer MCI the requested services at rates

lower than its geographically averaged rates. Although MCI withdrew its requests for proposal only one week after Southwestern Bell had filed the tariff amendment, Southwestern Bell subsequently clarified that the tariffs would remain available to any interexchange carrier similarly—through a bid proposal—requesting equivalent access services in the two study areas. Southwestern Bell based its deviation from its geographically averaged rates on the "competitive necessity doctrine." Originally recognized by the Commission in the context of volume discounts for long-distance service, this doctrine permits a discounted offering for a service where (1) an equal or lower priced alternative is generally available to customers of the discounted offering, (2) the terms of the discounted offering are reasonably designed to meet competition without undue discrimination, and (3) the discount contributes to reasonable rates and efficient services for all users. *See Private Line Rate Structure and Volume Discount Practices*, 97 F.C.C.2d 923, 948 (1984). In Southwestern Bell's view, the competitive necessity doctrine should apply in the local access market, and a request for proposal that asks for a competitive response was evidence that competition for the access services exists; the new rates were not discriminatory because they would be available to similarly situated customers; and the deviation would foster economic efficiency.

The Commission ultimately concluded that the tariff amendment was unlawful, on what it claimed were three "independent" grounds. The Commission found that the tariff amendment's language was vague and ambiguous in violation of Commission rules, *see* 47 C.F.R. §§ 61.2, 61.54(j) (1995), requiring tariff language to be clear and explicit. The Commission also determined—although Southwestern Bell had never contended to the contrary, and does not now—that the tariff amendment was inconsistent with the Commission's geographically averaged rate requirement and did not comply with the

Commission's explicitly recognized deviations from that requirement. And the tariff failed the first prong of the competitive necessity test: the existence of a request for proposal did not demonstrate that an equal or lower priced competitive alternative is generally available to customers of the discounted offering.

## II.

◼ Southwestern Bell contends that the Commission's decision as to vagueness does not independently justify its order.[1] We agree. The Commission found that Southwestern Bell had failed to "provide standards for determining what constitutes a 'competitive bid situation' and a *bona fide* [request for proposal]," and had failed to specify those access services that would be available and their corresponding rates. Southwestern Bell, however, submitted a clarification during the tariff investigation that a "competitive bid situation" would exist where an interexchange carrier received bids from at least one other vendor, and indicated that it would file the tariff modifications necessary to reflect the *future* prices and services it offered in response to requests for proposals. The Commission before us claims that such clarifications cannot cure the vagueness of the original tariff amendment, but as Southwestern Bell points out, it has been the Commission's policy to allow such clarifications, *see, e.g., Local Exchange Carrier Line Information Database*, 8 F.C.C. Rcd. 7130, 7133 (1993), and the Commission's order itself mentioned Southwestern Bell's clarification in a different section. We get the impression—the Commission's order is not precise—that the Commission concluded that the tariff remained vague because one could not tell *in advance*, before the bidding is completed, just what price Southwestern Bell was to charge. But the same thing is true of the rates charged by CAPs, who are also obliged to file tariffs. *See MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, ———— ,

---

1. Intervenors MCI and AT&T contend that Southwestern Bell's petition is not ripe for review, since Southwestern Bell has not shown that any interexchange carrier other than MCI (as to whose request for proposal the petition is moot) has requested bids for the access services in Southwestern Bell's tariff amendment. But Southwestern Bell's tariff amendment is really an offer to provide services at a rate other than its averaged rate; the Commission's determination that the amendment is unlawful makes the controversy justiciable.

114 S.Ct. 2223, 2232–33, 129 L.Ed.2d 182 (1994); *Southwestern Bell Corp. v. FCC,* 43 F.3d 1515, 1520 (D.C.Cir.1995). Thus, for the Commission to say that Southwestern Bell's tariff is too vague is really to conclude, for obviously different reasons, that Southwestern Bell must not be allowed to enter into a competitive bidding situation. That can only be because either the Commission does not believe the competitive necessity doctrine should apply to this situation because it cannot co-exist with the average rate regulatory regime, or that even if it does apply, Southwestern Bell did not meet its requirements. Although the staff has decided on the former ground in other proceedings, *see, e.g., New York Telephone Co.,* 5 F.C.C. Rcd. 6745 (1990), here the Commission did not wish to do so and instead assumed *arguendo* that the doctrine did apply but determined that petitioner did not meet its requirements. (The Commission's brief nevertheless contends, unlike its order, that petitioner's tariff is the entering wedge to demolish the average rate, which is to say that it cannot exist with the averaged rate regulatory regime.[2])

■ The Commission concluded that petitioner failed to show the first requirement of the test which, it will be recalled, requires an applicant to demonstrate that the competitor's equal or lower price is generally available. The Commission reasoned that evidence that a putative customer for a particular service has requested bids does not establish that there truly are actual competitors to Southwestern Bell. The bid "might be issued just to inquire about whether there are alternatives, and might be issued to companies that are unwilling or unable to provide the requested service." Accordingly, the Commission concluded that "the existence and degree of competition might be determined by the existence of *responses* to a [request for proposal] not by the existence of the [request for proposal] itself" (emphasis in the original).

But, as petitioner argues, a competitor's responses (bids) are not available to it before the bidding; if petitioner sought to gain them, presumably it would violate the antitrust laws and, at the very least, upset the competitive process. During the bidding, the common business practice is to treat responses as confidential, and, afterwards, it would obviously be too late for Southwestern Bell because the contract would have been awarded to another. Indeed, it is rather doubtful, according to petitioner, that it would even be able to detect from a CAP's tariff filings which price it actually charged in a successful bid. And CAPs can amend their tariffs with as little as one day's notice, *see Tariff Filing Requirements for Nondominant Common Carriers,* 10 F.C.C. Rcd. 13653, 13654 (1995), so Southwestern Bell can never anticipate what prices CAPs may bid. Southwestern Bell thus forcefully argues that the Commission's order puts petitioner in a classic Catch–22 situation—it must either obtain competitors' rates, which may violate the antitrust laws, or lose competitive bids—and accordingly cannot be regarded as other than arbitrary and capricious.

Neither the Commission's order nor its appellate presentation provides us with an adequate response to this argument.[3] The Commission's brief claims that petitioner's Catch–22 formulation is actually a new argument, not presented to the Commission, but this appears to us to be a futile effort to invoke the exhaustion doctrine. Southwestern Bell's argument was clearly presented to the Commission when it argued that it could not provide information on responsive bids and that access to such information would upset the competitive process; it need not seek rehearing merely to criticize the quality of the reasoning the Commission used in rejecting its position. To be sure, talented appellate counsel will often present the same basic argument in a more polished and imaginative form than the Commission saw, but that, unfortunate as it may be for the Commission (and fortunate for us), is not the

2. We of course cannot affirm the Commission's order on the basis of a theory not embraced by it until litigation. *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943).

3. The Commission's general appellate presentation was not particularly helpful.

same thing as presenting a new argument on appeal.

After carefully reviewing the record and arguments in this case, we get the distinct impression that the Commission, as a matter of regulatory policy, does not wish to permit the LECs to respond competitively to CAPs before the latter have achieved a stronger market position. But the difficulty with the Commission's order is that it does not say that, nor does it indicate how much new competition, even in general terms, it will require before the LECs are permitted to respond in accordance with the competitive necessity doctrine (or otherwise). In its order, the Commission said that Southwestern Bell would have to show "that at each of its central offices there is a competitor with an equal or lower priced alternative." We admit to being rather puzzled as to what the Commission means by that stray statement (which the Commission's brief never mentions); it certainly does not appear to be a clear holding as to the degree of genuine competition in the local access market that will justify Southwestern Bell's recourse to the competitive necessity doctrine in order to respond competitively to bid proposals.[4] And if it were so intended, it would be inconsistent with the balance of the Commission's rationale for rejecting petitioner's competitive necessity showing—that it needed to show something more with regard to a *specific* bidding situation.

In sum, we are compelled to remand this proceeding to the Commission for a more coherent, and perhaps more forthright, explanation of its actions. In so doing, we express no view as to the difficult underlying policy issues.

---

4. As a "central office" is simply the location at which LECs transmit local customer calls to interexchange carriers, *see Bell Atlantic Tel. Cos.,*

24 F.3d at 1443, it is unclear what, exactly, is meant by competition at a central office.