**U.S. AIRWAVES, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

NextWave Telecom Inc.,
et al., Intervenors.

Nos. 98–1266 & 98–1267.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 2000.

Decided Nov. 21, 2000.

Robert A. Long, Jr. argued the cause for petitioners. With him on the briefs was Andrew J. Heimert.

Stanley R. Scheiner, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan, and Andrea Limmer, Attorneys. John E. Ingle, Deputy Associate General Counsel, and James M. Carr, Counsel, Federal Communications Commission, entered appearances.

Ian Heath Gershengorn argued the cause for intervenor NextWave Telecom Inc. With him on the brief was Donald B. Verrilli, Jr. David A. LaFuria and Thomas Gutierrez entered appearances.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Before us are petitions for review of two rulemaking orders of the Federal Communications Commission. The orders changed the financial terms applicable to companies that purchased licenses to provide personal communications services (PCS) at an auction in which bidding was limited to small businesses and entrepreneurs. *See Amendment of the Commission's Rules Regarding Installment Payment Financing for [PCS] Licensees, Second Report and Order and Further Notice of Proposed Rule Making,* 12 F.C.C.R. 16,436, 1997 WL 643811 (1997) (*Restructuring Order*); and *Amendment of the Commission's Rules Regarding Installment Payment Financing for [PCS] Licensees, Order on Reconsideration of the Second Report and Order,* 13 F.C.C.R. 8345, 1998 WL 130176 (1998) (*Reconsideration Order*). Petitioners U.S. Airwaves, Inc. (hereinafter Airwaves) and Sprint Spectrum L.P. characterize the rules as a benefit given retroactively to incumbent licensees, to the detriment of losing bidders in the spectrum auction and of competitors in the PCS industry, and therefore as unauthorized, unreasonable, and arbitrary and

capricious. Intervenor NextWave Inc., a successful bidder in the original auction, supports the new rules; it also maintains that neither petitioner has standing to challenge them.

We hold that Airwaves, as a disappointed bidder in the original auction, does have standing to petition for review of the new rules; we therefore do not reach the question whether Sprint Spectrum L.P. also has standing. We hold further that, although the changes to the Commission's financing rules are indeed retroactive, the Commission had adequate reasons for adopting them, and that it reasonably balanced competing goals and acted within its statutory authority.

## I. Background

Broadband PCS are a type of mobile telephone technology. *See Omnipoint Corp. v. FCC,* 78 F.3d 620, 626 (D.C.Cir. 1996). In order to provide PCS a company must get from the Commission a license to use a portion of the electromagnetic spectrum. In 1994 the Commission decided to distribute such licenses through a system of competitive bidding, pursuant to 47 U.S.C. § 309(j)(1). *See Implementation of Section 309(j) of the Communications Act—Competetive Bidding, Second Report and Order,* 9 F.C.C.R. 2348, ¶¶ 54–58, 1994 WL 412167 (1994) *(2d R&O).* The Commission designated a portion of the spectrum for the provision of PCS and divided that portion into six blocks, which it labeled A through F. In keeping with its statutory mandate to "ensure that small businesses ... are given the opportunity to participate" in spectrum auctions, 47 U.S.C. § 309(j)(4)(D), the Commission limited the bidding for "C–block" spectrum to entrepreneurs and small companies. *See Restructuring Order* at ¶ 8; *cf. Omnipoint,* 78 F.3d at 626 (upholding the limitation). The Commission offered small businesses bidding for C–block licenses an "installment payment plan" under which they could pay 10% down and the balance "over a period of ten years, with interest

only paid for the first six years and interest and principal for the remaining four." *Restructuring Order* at ¶ 8. (Entrepreneurs who did not qualify as small businesses were offered less favorable payment terms.) *See id.* at n. 10.

Between May and July 1996 some 90 different bidders bought at auction 493 licenses—one for each "basic trading area" (BTA) in the nation—to use 30 MHz of spectrum for the provision of PCS. Their bids totaled $10.2 billion, a figure some observers attributed to irrational exuberance; on average, C–block licensees agreed to pay nearly three times per potential customer what the winning bidders in the A– and B–block auctions had paid. *See Restructuring Order* at ¶ 9 & n.11; Peter Spiegel, *Hollow Victory,* FORBES, Jan. 27, 1997, at 50.

Within nine months of the C–block auction, it became clear that a number of high bidders might not be able to make their scheduled payments. *See Wireless Telecommunications Bureau Seeks Comment on Broadband PCS C and F Block Installment Payment Issues, Public Notice,* 12 F.C.C.R. 21,015, 21,015 & n. 4, 1997 WL 291808 (1997). In March, 1997 the Commission suspended the payment obligations of all C–block licensees pending a review of its installment payment terms. *See Installment Payments for PCS Licenses, Order,* 12 F.C.C.R. 17,325, ¶ 2, 1997 WL 144207 (1997).

In October, 1997 the Commission issued the first of the two orders challenged in this case. That order ended the suspension of payments announced the previous March and offered a "menu" of new financing options to all C–block licensees. *See Restructuring Order* at ¶¶ 6, 25. Upon reconsideration the Commission retained the menu approach but altered several of the offerings in important particulars. *See Reconsideration Order* at ¶¶ 8–10. The revised scheme also permitted a licensee to select a different option for licenses it held in each "Major Trading Area" (MTA)—referring to the 51 geographic regions into

which the Commission has divided the nation—so long as it applied the same option to all its licenses within each MTA. *See Reconsideration Order* at ¶ 17. Upon the promulgation of the order on reconsideration, each licensee was required, in order to avoid default, to choose a menu option for each of its MTAs. *See id.* at ¶ 23.

The menu offered each licensee four choices. First, the licensee could continue to make payments under the original terms of the auction. *See Restructuring Order* at ¶ 6.

Second, the licensee could surrender all its licenses for a particular MTA and receive a "prepayment credit" in an amount equal to 70% of the down payments and 100% of any installment payments it had made on those licenses, as well as forgiveness of its debt on the returned licenses. The prepayment credit would be put toward payment for such other PCS licenses as the licensee continued to hold. The licensee could either provide additional funds in order to prepay all the licenses it retained in a given MTA or, were it to rely solely upon its prepayment credits, could prepay as many licenses as possible in a given MTA and surrender any remaining licenses to be auctioned anew. *See Restructuring Order* at ¶ 64; *Reconsideration Order* at ¶¶ 38, 41–43.

Third, the licensee could elect to "disaggregate" each of its licenses within a given MTA, returning 15 MHz of spectrum to the Commission and retaining 15 MHz under license. The licensee's outstanding debt to the Commission with respect to returned spectrum would be forgiven. The licensee would also receive a credit equal to 40% of its down payments on the returned spectrum, which it could apply to the payments due on the retained spectrum. A licensee combining disaggregation and prepayment would receive a credit equal to 70% of its down payment for returned spectrum, which it could use to prepay the Commission either for the retained 15 MHz of the disaggregated licenses or for other PCS licenses it retained.

*See Restructuring Order* at ¶¶ 38–39; *Reconsideration Order* ¶¶ 51, 54.

Finally, the licensee could simply surrender its licenses for a particular MTA and be forgiven its outstanding debt with respect to those licenses. A licensee electing this so-called "amnesty" option could either retain the right to rebid when its licenses were sold at auction again or forego the opportunity to rebid and receive a credit of 70% of its original down payment; it could apply that credit to payments due in connection with the prepayment or disaggregation of licenses that it retained in other MTAs. *See Reconsideration Order* at ¶ 12.

The Commission states that in crafting this menu of options it "considered and balanced" several policy goals: maintaining the integrity of spectrum auctions; ensuring fairness to actual and prospective licensees; resolving all issues promptly; and complying with its statutory mandates to "[p]romot[e] economic opportunity and competition in the marketplace," and to "ensure 'that new and innovative technologies are readily accessible to the American people by avoiding excessive concentrations of licenses and by disseminating licenses among a wide variety of applicants, including small businesses.'" *See Restructuring Order* at ¶ 2 (quoting 47 U.S.C. § 309(j)).

## II. Analysis

Airwaves and Sprint PCS contend that the Commission changed its original auction rules arbitrarily and capriciously and without statutory authority. After analyzing the petitioners' standing, we consider the Commission's claim that the new rules were foreshadowed in the original auction rules and therefore do not represent a significant change in policy. We then turn to the questions of arbitrariness and of statutory authority.

### A. Do petitioners have standing?

■ The "irreducible constitutional minimum" for standing in an Article III court

is that the petitioner was injured in fact, that its injury was caused by the challenged conduct, and that its injury would likely be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). NextWave Inc., intervening in defense of the Commission, argues that Airwaves lacks standing because it can demonstrate neither that it was injured in fact nor that its alleged injury is redressable.

A bidder in a government auction has a "right to a legally valid procurement process"; a party allegedly deprived of this right asserts a cognizable injury. *DIRECTV, Inc. v. FCC,* 110 F.3d 816, 829 (D.C.Cir.1997). A disappointed bidder "need not ... demonstrate that it would be successful if the contract were let anew" but only that it was " 'able and ready to bid ... and that the [rule] prevent[ed] it from doing so on an equal basis.' " *Id.* at 829–30 (quoting *Northeastern Fla. Chapter of Assoc. Gen. Contractors of America v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)). Of course, in order to show that its injury is redressable, a disappointed bidder must demonstrate that it is "ready, willing, and able" to participate in a new auction should it prevail; but it need not demonstrate that it will participate in such an auction regardless of the circumstances then prevailing. *See Orange Park Florida T.V., Inc. v. FCC,* 811 F.2d 664, 672 & n. 18 (D.C.Cir.1987).

Airwaves meets these requirements. It submitted bids in the original C–block auction but dropped out before securing any licenses. It claims that it would have bid more had it known that financial terms more favorable than those announced at the time of the auction would later be offered to winning bidders. Airwaves further affirms, in the sworn declaration of its chief executive, that it "intends" to bid in a future reauction of PCS spectrum and that it is able to raise the capital necessary to do so. That is sufficient.

NextWave also argues that Airwaves cannot base its standing upon its participation in the original auction because Airwaves acknowledges that the original auction was fair; Airwaves challenges only the way in which the Commission treated licensees after the auction was completed. In this argument, however, NextWave misapprehends Airwaves' claim, which is that post-auction revisions to the financing options available to the high bidders constitute impermissibly retroactive changes to the initial auction rules. There is no basis for suggesting, as NextWave seems to do, that *ex post* changes can never affect the validity of a government auction.

Finally, NextWave argues that Airwaves fails to demonstrate that its claim is redressable by this court because it does not allege that when it petitioned for review of the new rules it was ready, willing, and able to bid in a new auction. NextWave asserts that as of that date Airwaves had returned all its investment capital to its investors and was not in good standing in the State of Delaware because of a tax dispute, for both of which reasons it would have been unable to bid in any new auction that the Commission might have conducted. NextWave's premise is correct: Standing is determined as of the date an action is filed, *see Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); but NextWave offers no persuasive reason to think either that Airwaves lacked access to capital on that date or that it would not have resolved its tax dispute in Delaware had that been necessary in order to bid in a new auction. (In fact, the tax matter was resolved soon after the filing.) Absent any evidence to the contrary, Airwaves' assertion that it was ready, willing, and able to participate in a rerun of the C–block auction satisfies the redressability requirement.

Having determined that Airwaves has standing, we do not need to reach the question whether Sprint Spectrum L.P.

has standing as well, for Sprint presents no arguments beyond those made by Airwaves. *See Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 810 (D.C.Cir.1993) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case").

*B. Is the rule retroactive?*

█ Airwaves argues that the changes in the Commission's auction rules give a windfall to C–block licensees. The Commission and NextWave respond that the original auction rules anticipate the possibility that the Commission might revise its financing provisions, making the adoption of the new rules foreseeable.* *Cf. Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547, 549 (D.C.Cir.1983) (holding that final administrative rules that depart from an agency's initial proposals do not require new notice and comment if the final rules are a "logical outgrowth" of the proposals, such that the parties "should have anticipated [that they] might be imposed").

The Commission points out that the original auction rules provided that "as a general rule" a defaulting bidder's licenses would be deemed forfeit and reauctioned, *2d R&O* at ¶ 204, which reasonably can be taken to suggest that forfeiture and reauction were not to be the inevitable consequence of default. More important, the original rules specifically allowed a licensee "that has defaulted or that anticipates default under an installment payment program" to obtain a "three to six month grace period" during which to "seek from the Commission a restructured payment plan." *Id.* at ¶ 240. In addition, the original rules provided that default would occasion a "substantial penalty," *Implementation of Section 309(j) of the Communications Act—Competitive Bidding, Fifth Report and Order,* 9 F.C.C.R.

5532, ¶ 75, 1994 WL 372170 (1994), and under the revised rule every licensee that fails to honor its original payment obligations forfeits at least 30% of its down payment on all spectrum that it returns to the Commission.

In some respects, however, the new rules clearly do contradict the Commission's previously stated policies. The initial auction rules provided that the Commission would consider requests for financial restructuring on a "case-by-case basis." *2d R&O* at ¶ 240. This certainly implied that the Commission would not proceed by way of a further rulemaking and a new rule of general application, *see Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 209, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The distinction is significant, for the initial auction rules made only those licensees "that ha[d] defaulted or that anticipate[d] default" eligible for a grace period and financial restructuring. *2d R&O* at ¶ 240. The C–block menu, in contrast, is available to all licensees regardless of their financial condition. *See Restructuring Order* at ¶ 6.

█ The new regulations therefore do not merely fill in the details of a policy foreseeable at the time of the original C–block auction; instead, they constitute a secondarily retroactive change to the rules governing that auction. *See Bowen,* 488 U.S. at 219, 109 S.Ct. 468 (1988) (Scalia, J., concurring) (defining "secondary retroactivity" as describing "rule[s] with exclusively future effect [that] . . . affect past transactions") (emphasis omitted). A secondarily retroactively rule is valid only to the extent that it is reasonable—both in substance and in being made retroactive. *See id.* at 220, 109 S.Ct. 468. It is to reasonableness that we turn next.

*C. Are the regulations reasonable?*

Airwaves argues that the rule is invalid for two related reasons. First, it contends

---

* The implication of the Commission's account is that the possibility of new rules is fully

reflected in the prices paid; hence there is no windfall.

that the Commission failed to relate its offering of post-auction refinancing options to its own stated goals. Second, it argues that regardless whether the Commission embraced fairness as a goal, the rule is simply so unfair that it must be deemed arbitrary and capricious.

■■■ Under the arbitrary and capricious standard, this court does not substitute its judgment for that of the administrative agency. *See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A regulatory decision in which the Commission must balance competing goals is therefore valid if the agency can show that its resolution "reasonably advances at least one of those objectives and [that] its decisionmaking process was regular." *Fresno Mobile Radio, Inc. v. FCC,* 165 F.3d 965, 971 (D.C.Cir.1999). Because Airwaves does not challenge the regularity of the Commission's decisionmaking process, the issue now before us is whether the Commission reasonably justified its regulations with reference to at least one of its avowed goals. *See Restructuring Order* at ¶ 2.

The C–block menu withstands review under this standard: The Commission justified each of the menu options and its MTA-by-MTA selection principle with reference to one or more of its stated goals. In particular, the Commission justified each of its menu options as "enabling C block licensees to remain participants in the wireless market," which it found would hasten "the delivery of new services to the public" and promote efficient use of the spectrum. *Reconsideration Order* at ¶ 10; *see Restructuring Order* at ¶¶ 43, 45 (disaggregation); *id.* at ¶ 53 (amnesty); *Reconsideration Order* at ¶ 40 (prepayment). In addition, the Commission justified the prepayment option as a way of minimizing conflicts between the agency's roles as creditor and as regulator. *See Reconsideration Order* at ¶ 40. The Commission explained disaggregation, as it did the provision for MTA-by–MTA election, in part

as an effort to help small licensees plan their businesses rationally. *See Restructuring Order* at ¶ 45; *Reconsideration Order* at ¶ 19.

Airwaves challenges the Commission's rationale in two respects. Its first point proceeds from the observation that the Commission deemed "essential" two and only two of its stated goals, namely, maintaining the integrity of the auction process and ensuring fairness to all market participants. *Restructuring Order* at ¶ 3. Airwaves claims that it is unreasonable for the Commission to adopt any policy that undermines a goal that the agency itself has styled "essential." This is an unduly cramped reading of the orders, however. The Commission reasonably can treat fairness and integrity as "essential" goals and yet recognize that they are matters of degree. Thus, the Commission may choose to sacrifice some degree of fairness or integrity in order to gain other important objectives. Several of the goals that the Commission lists in addition (and therefore potentially in opposition) to fairness and integrity—such as competition, speedy deployment of services to the public, efficient use of the spectrum, and participation of small businesses in the market—are mandated by statute. *See* 47 U.S.C. § 309(j)(3). A more reasonable construction of the Commission's statement that fairness and integrity are "essential" goals, therefore, is that in its view they must be included (along with those specified in the statute) among the goals to be balanced. This by no means requires that they trump all other goals in every case where there is conflict.

■■■ Airwaves also argues that, aside from the orders' failure to advance the Commission's "essential" goals, they also fail to advance the other goals the Commission invoked as justifications for the menu options. For example, Airwaves argues that, contrary to the Commission's claims, the rule will retard rather than hasten the availability of services to consumers; instead of forcing a reauction that

would transfer spectrum to competent and solvent firms, the rule allows precisely those companies that "have demonstrated financial irresponsibility and undue optimism about their financial capabilities" to retain their spectrum. New buyers at auction may, as the petitioner asserts, be more likely to effectuate a rapid buildout of wireless systems, but the Commission is reasonably of the view that starting the licensing process all over again would delay build-out. We defer to the agency regarding a predictive matter, such as this, within its expertise. *See Fresno Mobile Radio,* 165 F.3d at 971.

In a similar vein, Airwaves complains that, contrary to the Commission's expectation, the rule will not promote the participation of small businesses in the wireless industry; that goal would be better effected by redistributing licenses to small businesses in a new auction than by reinforcing the current concentration of C–block licenses in relatively few hands. The petitioner's position is again plausible, but it is also reasonable, again, for the Commission to expect that small businesses generally will be better situated to face their larger competitors in the wireless industry if those that already have licenses are able to build their businesses in at least some markets. Again, we defer to the Commission's expertise regarding such predictive issues.

Notwithstanding the Commission's reasoned justification, the rule might still be arbitrary and capricious if, as Airwaves claims, it is sufficiently unfair. We agree with the petitioner that the Commission systematically downplays the inequity of the rule: it clearly grants a substantial windfall not only to distressed but also to healthy companies that bought licenses in the initial auction. Those companies can now discard the licenses they have found, with the benefit of hindsight, to be less valuable—without incurring the ordinary penalty for default and, indeed, while recouping some of the payments they have already made. At the same time they can retain the licenses they have found to be more valuable, subject only to the requirement that they elect a single menu option within each MTA. Further, the rule allows them not only to concentrate their resources in the most desirable markets but to apply to the spectrum they retain some of the payments they had made on spectrum they returned. Obviously, those who were outbid in the original auction would have bid more than they actually did—and might have bid enough to win licenses—had they known that the Commission later would make such options available.

Having established that the Commission changed the rules in a way that could not be foreseen, the question is whether, under the circumstances, that was so unfair as to be arbitrary and capricious. We start from the intuitive premise that an agency cannot, in fairness, radically change the terms of an auction after the fact. At the same time, an agency must be allowed to adjust its policies to changing circumstances, within the framework of rules it established in advance of the auction. In this case the Commission determined that the statutory goals of speeding the delivery of service to the public and of facilitating the participation of small businesses in the wireless market required it to liberalize the financial terms available to C–block licensees. *See Reconsideration Order* at ¶¶ 7–8. Competing goals do not absolve the agency of its duty to losing bidders, of course, but the Commission was careful to temper its liberalization accordingly. The agency did not simply forgive agreed-upon payments, much less grant the winning bidders' more sweeping requests for relief. Rather, under each of the menu options it imposed upon every distressed licensee a "substantial penalty"—in every case at least 30% of the down payment for a returned license, and up to 60% in the case of a licensee choosing disaggregation without prepayment.

Considering the dramatic and unexpected business reversals faced by C–block

licensees, and post-auction conditions in the wireless market, we think the Commission reasonably exercised its discretion to balance fairness to losing bidders with the needs of the market and with the public interest. We therefore conclude that the orders under review are consistent with the Commission's stated goals, and that such unfairness as they worked does not render them arbitrary and capricious.

### D. Did the Commission exceed its statutory authority?

■ The Commission conducts spectrum auctions pursuant to its authority to grant licenses "through the use of a system of competitive bidding." 47 U.S.C. § 309(j)(1). Airwaves argues that post-auction concessions made to the winning bidders effectively render the auction non-competitive and therefore without statutory authorization. Airwaves argues further that retroactive changes to auction rules violate the requirement that the Commission "ensure that . . . an adequate period is allowed . . . after issuance of bidding rules[ ] to ensure that interested parties have a sufficient time to develop business plans, assess market conditions, and evaluate the availability of equipment." *Id.* § 309(j)(3)(E). Airwaves' argument here is that post-auction rule changes necessarily leave no time for interested parties to plan, assess, or evaluate.

These arguments were not put before the Commission and are therefore not properly before this court. *See Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 680 (1983) ("[C]laims not presented to the agency may not be made for the first time to a reviewing court"). Airwaves suggests that the issue was adequately raised before the Commission in the comment of another party, which argued that "Section 309(j) does *not* . . . contain any provision allowing the Commission to change the amount owed the government as a result of an auction." The broad and general claim that the Commission lacks statutory authority "to

change the amount owed" is materially different, however, from Airwaves' specific argument that the Commission violated the statutory provisions requiring "a system of competitive bidding" and "an adequate period" for planning after auction rules are issued. Confronted only with the former, broad claim, the Commission had no notice of the specific objections now raised by Airwaves. As we have said more than once before, a litigant may not " 'sandbag' agencies by withholding legal arguments . . . until they reach the courts of appeal." *USAir, Inc. v. Department of Transp.,* 969 F.2d 1256, 1260 (D.C.Cir. 1992).

### III. Conclusion

In summary, we hold that the changes to the Commission's C–block auction rules are neither arbitrary and capricious, nor unreasonable, nor without statutory authority. Therefore the petitions to review the rules are

*Denied.*