# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 18, 2008                    Decided May 2, 2008

No. 07-1416

SPRINT NEXTEL CORPORATION,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

Consolidated with
07-1458

On Appeal and Petition for Review of Orders of the
Federal Communications Commission

*Christopher J. Wright* argued the cause for appellant. With him on the briefs were *Timothy J. Simeone*, *Stephanie Weiner*, *Leonard J. Kennedy*, General Counsel, and *Robert S. Foosaner*, Senior Vice President, Government Affairs, Sprint Nextel Corporation.

*Charles W. Logan, Jr.* was on the brief for *amicus curiae* Fraternal Order of Police in support of appellant.

*Joel Marcus*, Counsel, Federal Communications Commis-

sion, argued the cause for appellee. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, *Robert B. Nicholson* and *James J. Fredricks*, Attorneys, U.S. Department of Justice, *Matthew B. Berry*, Acting General Counsel, *Joseph R. Palmore*, Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel, Federal Communications Commission.

*Robert M. Gurss* was on the brief for *amicus curiae* Association of Public-Safety Communications Officials-International in support of appellee.

Before: SENTELLE, *Chief Judge*, and GINSBURG and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Mobile communications devices are now an integral part of the daily activities of consumers, businesses, and public safety agencies alike. And when such a device is needed—whether to track down an errant teen or request backup while in hot-pursuit of a suspect—we expect it to work. That requires the 800 MHz electromagnetic spectrum, on which many of these devices operate, to be in order. This case arises out of the Federal Communications Commission's efforts to ensure that it is.

The Commission set out to restructure the 800 MHz spectrum. Sprint Nextel Corporation now appeals a Commission order implementing this restructuring. 47 U.S.C. § 405(a) bars most of Nextel's arguments because the Commission did not have an "opportunity to pass" on them and Nextel failed to petition for reconsideration. On the merits, we reject Nextel's argument that the Commission acted arbitrarily and capriciously. We therefore affirm.

3

I

The Commission licenses commercial entities and public safety agencies to use the 800 MHz band. But this band is plagued by an "interference problem" that stems from an "incompatible mix" of "two types of communications systems": (1) "cellular-architecture" systems and (2) "high-site non-cellular systems" frequently used by public safety agencies. *Improving Public Safety Communications in the 800 MHz Band*, 19 F.C.C.R. 14,969, 14,972 (Aug. 6, 2004) ("*Initial Order*"). The closer these incompatible systems are to one another on the spectrum, the more interference they cause. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 5 (D.C. Cir. 2006). Nextel holds licenses for a large share of the 800 MHz spectrum, and it uses ESMR[1] cellular-architecture technology.

In 2002, the Commission "initiated a rulemaking and solicited proposals to remedy the interference problem." *Id.* It sought to "abate[]" interference experienced by public safety agencies and quickly provide them with "additional 800 MHz spectrum"—all through an "equitable" process that minimizes disruption to 800 MHz licensees. *Initial Order*, 19 F.C.C.R. at 14,972–73. Nextel and other licensees submitted a Consensus Plan "propos[ing] that the Commission segregate high-site and ESMR systems into a separate block of the 800 MHz band." *Mobile Relay*, 457 F.3d at 5. In 2004, the Commission's *Initial Order* "largely adopted the Consensus Plan's structural solution," segregating incompatible systems by placing them in separate "blocks" of spectrum. *Id.* at 5–6.

The *Initial Order* gave Nextel a central role in the rebanding process. Nextel would (1) relinquish its 700 MHz spectrum, (2) vacate certain 800 MHz spectrum in the "General

---

[1] "ESMR" denotes Enhanced Specialized Mobile Radio.

Category" and "Interleaved" areas of the band, and (3) fund the relocation of other licensees. *See Initial Order*, 19 F.C.C.R. at 15,080–81. For its part, the Commission would (1) allow Nextel to operate on other 800 MHz spectrum vacated by public safety licensees, (2) authorize commercial mobile service operations in the 900 MHz band, and (3) favorably modify Nextel's 1.9 GHz spectrum licenses. *Id.*

Under the *Initial Order*, licensees would relocate to different blocks of the 800 MHz band. "NPSPAC"[2] public safety licensees would move from the current NPSPAC channels to General Category channels; Nextel would be responsible for moving itself and other General Category licensees from the General Category to other parts of the band; and Nextel would eventually move into channels vacated by the NPSPAC licensees. *Id.* at 14,984–85. In addition, Nextel would vacate its Interleaved channels. *Id.*[3] The Commission ordered Nextel to complete band reconfiguration within 36 months of the starting date announced in a public notice. *Id.* at 14,986–87. We now know the 36-month deadline is June 26, 2008. *Improving Public Safety Communications in the 800 MHz Band*, 22 F.C.C.R. 17,209, 17,217 (Sept. 12, 2007) ("*Third MO&O*").

The facts outlined above are undisputed, but the *timing* of the rebanding process is quite controversial. The *Initial Order* described the timing of the spectrum exchange as follows:

---

[2] "NPSPAC" refers to the National Public Safety Planning Advisory Committee.

[3] The *Initial Order* required Nextel's approval, 19 F.C.C.R. at 15,128, but Nextel didn't agree with all of its terms. The Commission therefore issued a *Supplemental Order* modifying or clarifying certain terms. *See Improving Public Safety Communications in the 800 MHz Band*, 19 F.C.C.R. 25,120 (Dec. 22, 2004).

Although Nextel will ultimately relocate from the current General Category and interleaved channels to the old NPSPAC block, it will not do so directly. Instead, it will need to relocate many of its operations to temporary channels in the 800 MHz band or to spectrum in the 900 MHz band while it is clearing the General Category block . . . . Only after the new NPSPAC block is cleared of incumbents and NPSPAC operations can be relocated there will Nextel be able to move its operations back from the 900 MHz band to the old NPSPAC block.

19 F.C.C.R. at 15,113 n.712; *see also id.* at 15,073–74. However, the *Supplemental Order* assured Nextel it could retain its General Category channels until the "last step in the process." 19 F.C.C.R. at 25,143.

As implementation began, so did delays. By fall 2007, only a small fraction of public agencies had relocated to their new 800 MHz spectrum. Here's the rub: many NPSPAC licensees will not be ready to vacate their spectrum by June 2008, and many will need until 2009 or 2010.

In September 2007, the Commission issued the *Third MO&O*. It ordered Nextel to vacate its General Category and non-border Interleaved channels by June 26, 2008, "regardless of whether all NPSPAC licensees in a given region are prepared to relocate within that time frame." *Third MO&O*, 22 F.C.C.R. at 17,216–18. In other words, the Commission told Nextel to timely vacate its channels—even if the former NPSPAC channels to which Nextel will eventually move are currently unavailable.

Three other aspects of the *Third MO&O* bear mention. First, as of January 1, 2008, Nextel must vacate any of its General Category channels upon 60 days' notice from a

NPSPAC licensee. *Id.* at 17,216. Second, if the Commission grants a waiver of the June 2008 deadline to a NPSPAC licensee, Nextel may petition for a waiver to temporarily remain on the General Category channels the NPSPAC licensee will eventually occupy. *Id.* at 17,217. Such a petition must meet certain criteria, and no such waiver process exists for the Interleaved channels. *See id.* at 17,217–18. Third, the Commission concluded Nextel had not fully met an interim 18-month benchmark, but the Commission didn't formally fault Nextel for non-compliance and it deferred consideration of any potential enforcement action. *See id.* at 17,213–15.

The Commission issued a *Public Notice* along with the *Third MO&O*. *See Public Notice*, 22 F.C.C.R. 17,227 (Sept. 12, 2007). The *Public Notice* established new interim deadlines for NPSPAC licensees. *Id.* at 17,227–28. However, it cautioned them not to request extensions past June 26, 2008, and it indicated the Commission may hold such requests in abeyance. *Id.* at 17,231. Nextel then appealed the *Third MO&O* and the *Public Notice*.[4]

---

[4] Nextel filed two separate actions under two distinct jurisdictional provisions. It filed No. 07-1458 under 47 U.S.C. § 402(a) and No. 07-1416 under § 402(b). These provisions are mutually exclusive. *See N. Am. Catholic Educ. Programming Found., Inc. v. FCC*, 437 F.3d 1206, 1208 (D.C. Cir. 2006). We have jurisdiction under § 402(b)(5), which permits "the holder of any ... license which has been modified or revoked by the Commission" to appeal an adverse decision. Accordingly, we dismiss the case filed under § 402(a).

II

A

We must determine which arguments, if any, Nextel adequately raised before the Commission.  47 U.S.C. § 405(a) provides that filing a reconsideration petition before the Commission is "a condition precedent to judicial review … where the party seeking such review … relies on questions of fact or law upon which the Commission … has been afforded no opportunity to pass."  Nextel did not petition for reconsideration, so we must ask whether the Commission "has been afforded" an "opportunity to pass" on the arguments.  The pith of the test is this: "the argument made to the Commission" must "necessarily implicate[]" the argument made to us.  *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 80 (D.C. Cir. 1998).  We may, however, consider "the same basic argument in a more polished and imaginative form."  *Sw. Bell Tel. Co. v. FCC*, 100 F.3d 1004, 1007–08 (D.C. Cir. 1996).

Nextel insists it orally presented its arguments to the Commission during meetings.  But appellate briefs recounting oral statements purportedly made to the Commission cannot satisfy § 405.  Far from it.  Statutes expressly limit our review to "the record."  47 U.S.C. § 402(g) (citing 5 U.S.C. § 706).  Besides, expanding the § 405 inquiry to non-record material would draw us into a messy game of fact-finding and credibility determinations—neither of which is our forte.

Nextel also relies on *ex parte* notices it filed with the Commission.  *Ex parte* notices can satisfy § 405.  *See MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000).  We will therefore review Nextel's *ex parte* notices under § 405, but future litigants should note that relying on such notices to satisfy § 405 is a risky strategy.  After all, "the Commission

need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner." *New Eng. Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 79 (D.C. Cir. 2003) (quotation marks and brackets omitted).

Nextel insists it raised all of its arguments in the *ex parte* notices. We think not. Nextel's *ex parte* notice only argued—in quite general terms—that the Commission unreasonably changed the rebanding process from a synchronized spectrum swap to an asynchronous exchange. Consequently, that is the only argument Nextel preserved for our review.

B

We now proceed to the merits. "Under the arbitrary and capricious standard, this court does not substitute its judgment for that of the administrative agency." *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 234 (D.C. Cir. 2000). "A regulatory decision in which the Commission must balance competing goals is … valid if the agency can show that its resolution 'reasonably advances at least one of those objectives and that its decisionmaking process was regular.'" *Id.*

The crux of the dispute is this: Nextel claims the *Initial Order* contemplated a simultaneous spectrum swap between Nextel and NPSPAC licensees, but the Commission argues the June 2008 deadline applies to Nextel regardless of whether NPSPAC licensees are ready to swap. The words of a great playwright aptly describe the Commission's position: "There is a time for departure even when there's no certain place to go!" TENNESSEE WILLIAMS, CAMINO REAL 78 (New Directions 1970) (1953). But Nextel claims that this position is arbitrary and capricious, and that it will cripple Nextel's network, "'squander scarce spectrum,'" and "'harm public safety.'" *See Third*

*MO&O*, 22 F.C.C.R. at 17,217. Nextel also complains that the Commission insufficiently responded to its concerns.

We disagree. In the *Third MO&O*, the Commission delineated four reasons why its position would advance the public interest. First, it would eliminate the risk of interference between Nextel and NPSPAC licensees that could otherwise occur if NPSPAC licensees were to relocate to an area of the band in which Nextel still operates. *Id.* Second, it would "simplify and expedite the transition process" because NPSPAC licensees would no longer "need to coordinate their relocation with [Nextel] to avoid … interference." *Id.* Third, it would make spectrum "available to new public safety facilities." *Id.* Fourth, it would give Nextel quicker access to certain 800 MHz spectrum "being vacated by NPSPAC licensees." *Id.*[5]

We hold the Commission did not act arbitrarily or capriciously. One "paramount" reason for rebanding was to abate interference experienced by public agencies. *Initial Order*, 19 F.C.C.R. at 14,972. Nextel's technology causes substantial interference when operated in close proximity to public agencies on the band. Thus, the *Initial Order* required Nextel to vacate certain channels by June 26, 2008. That deadline—which was never premised on a synchronized spectrum swap—has not changed. What has changed are the implications of the deadline: it now appears Nextel might have insufficient spectrum come June because numerous NPSPAC licensees won't be ready to relocate.

---

[5] This four-part response was sufficiently detailed, especially since the *ex parte* notices barely even raised a legal argument. As we have repeatedly stressed, the "'Commission cannot be asked to make silk purse responses to sow's ear arguments.'" *See, e.g.*, *Competitive Telecomms. Ass'n v. FCC*, 309 F.3d 8, 17 (D.C. Cir. 2002).

Nonetheless, the Commission's decision to hold Nextel to the June 26, 2008 deadline is reasonable. If Nextel completely vacates its General Category channels on June 26, there is reason to believe it will immediately reduce interference experienced by public safety licensees already operating in that portion of the band. This rationale applies with at least as much force in the Interleaved spectrum, where incompatible technologies now operate in close proximity. Moreover, if Nextel vacates non-border Interleaved spectrum by June 26, it will probably allow the Commission to quickly achieve another one of the *Initial Order*'s objectives: making additional Interleaved spectrum available for public agencies. Furthermore, although Nextel maintains that public agencies using its network will be harmed, the Commission's decision that "NPSPAC licensees take precedence" over Nextel's network is a rational policy judgment. *See Third MO&O*, 22 F.C.C.R. at 17,216. Even if the Commission's choice will cause disruption to Nextel's network, the Commission "balance[d] competing goals" in a way that "'reasonably advances'" some of the *Initial Order*'s objectives. *See U.S. Airwaves*, 232 F.3d at 234.[6]

III

For the foregoing reasons, the challenged orders are

*Affirmed.*

---

[6] This case does not raise the issue whether the Commission may revoke Nextel's licenses if it fails to meet the June 26, 2008 deadline. *See generally Initial Order*, 19 F.C.C.R. at 14,987 ("If Nextel fails to meet" the June 26, 2008 deadline "*for reasons that Nextel could reasonably have avoided*," the Commission may decide "whether forfeitures should be imposed and/or whether Nextel licenses … should be revoked." (emphasis added)).